# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**INGRID MAGOFFE**, as Personal Representative of
the **ESTATE OF ANTHONY MAGOFFE**, deceased,
Individually, and as Next Friend of her minor children,
**ANTHONY JAMES MAGOFFE**, and **JIMMY
MAGOFFE**; and **AZUCENA MICHEL**, as Personal
Representative of the **ESTATE OF CAMERINO
MICHEL RAMIREZ**, deceased, Individually, and as
Next Friend of her minor children, **MELISSA ORNELAS
MICHEL**, **ANTHONY ORNELAS MICHEL**, and
**MELANIE ORNELAS MICHEL**; and
**JAMES MAGOFFE**, Individually,

        Plaintiffs,

        vs.                                  No. CIV 06-0973 MCA/ACT

**JLG INDUSTRIES, INC.**, a Pennsylvania corporation;
and **UNITED RENTALS NORTHWEST, INC.**,
an Oregon corporation,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the following motions: (1) *Defendant
JLG Industries, Inc.'s Motion for Summary Judgment* [Doc. 149] filed on February 1, 2008;
(2) Defendant *JLG's Motion to Exclude Opinions of Charles Proctor* [Doc. 154] filed on
February 1, 2008; (3) Defendant *JLG's Motion to Exclude Opinions of Vincent Gallagher*
[Doc. 155] filed on February 1, 2008; (4) *JLG's Motion to Strike Affidavit of James Magoffe*
[Doc. 184] filed on March 10, 2008; (5) Defendant *JLG's Motion to Strike Affidavit of*

*Vincent Gallagher* [Doc. 186] filed on March 10, 2008; and (5) Defendant *JLG's Motion to Strike Affidavit of Charles Proctor* [Doc. 187] filed on March 10, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court finds that Defendant JLG Industries, Inc. is entitled to summary judgment on all of Plaintiff's claims for the reasons set forth below.  The Court also grants Defendant JLG's motions to strike the affidavit of Plaintiff James Magoffe and to exclude the testimony of Plaintiffs' experts, Charles Proctor and Vincent Gallagher.[1]

## I.  __BACKGROUND__

On September 8, 2006, Plaintiffs filed a civil action in the Second Judicial District Court for the County of Bernalillo, State of New Mexico, asserting the following claims against Defendants JLG Industries, Inc. ("JLG"), and United Rentals Northwest, Inc. ("United Rentals"):  (1) strict liability for defective design and manufacture; (2) negligence; (3) negligent infliction of emotional distress; and (4) loss of consortium.  Each of these claims arises from a fatal accident in which two workers fell to their deaths when an "500 RTS" scissor lift manufactured by Defendant JLG and owned by Defendant United Rentals tipped over in an aircraft hanger in Albuquerque, New Mexico, on or about April 1, 2006.  Plaintiffs in this case are the brother of one of the deceased workers, their personal representatives, and the next friends of their minor children.

---

[1]By letter dated May 7, 2008, counsel informed that Court that all of Plaintiffs claims against Defendant United Rentals Northwest, Inc., were settled and that all motions pertaining to Defendant United Rentals were withdrawn.

The "500 RTS" scissor lift involved in the fatal accident can be described as a portable elevator on wheels with a retractable work platform on which the two workers were standing when the lift started tipping over on its side. In order to prevent such tip-over accidents, the scissor lift is equipped with four outriggers or leveling jacks which are designed to hold the lift in a stable, level, and immobile position while the work platform is elevated. In this case, however, the scissor lift became unstable and tipped over because one of its leveling jacks was improperly raised while the work platform was approximately 45 to 50 feet above the concrete floor of the aircraft hangar. With one of its leveling jacks raised, the scissor lift allegedly tipped over in a manner similar to the way a chair would tip over if it suddenly lost one of its legs.

On October 10, 2006, Defendants JLG and United Rentals removed this action to the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1441 based on diversity of citizenship under 28 U.S.C. § 1332. [Doc. 1.] On October 16, 2006, Defendant JLG filed an *Answer* which asserted, among other things, that "the product in question had been modified and/or altered by third parties over whom this Defendant had no control." [Doc. 3, at 7.] Defendant United Rentals also filed its *Answer* on that date. [Doc. 5.]

On January 16, 2007, the Court entered an *Initial Pretrial Report* [Doc. 18] setting a number of case management deadlines leading up to a pretrial conference scheduled for March 4, 2008, and a jury trial scheduled to commence on a trailing docket beginning April 8, 2008. [Doc. 18.] In the *Initial Pretrial Report*, the parties indicated that they did not

intend to file any amended pleadings, but that such amendments might be necessary if discovery reveals new claims or defendants. [Doc. 18, at 2-3.] The *Initial Pretrial Report* also set a deadline of September 10, 2007, for the completion of all discovery, with earlier deadlines for the disclosure of expert reports pursuant to Fed. R. Civ. P. 26. [Doc. 18, at 7-8.] An *Order* filed on December 18, 2006, by the assigned Magistrate Judge set a deadline of March 16, 2007, for Plaintiffs to amend their pleadings or add additional parties. [Doc. 16.]

On March 15, 2007, the parties filed a *Joint Motion to Extend Pre-Trial Deadlines* [Doc. 33] based on their assertion that testing the equipment at issue in the accident had been delayed until the first week of May 2007, and that the proposed extensions would not affect the scheduled trial date of April 8, 2008. The assigned Magistrate Judge granted the joint motion, thereby extending the deadline for amending pleadings until May 16, 2007, with discovery to be completed by November 9, 2007. [Doc. 34.]

On the deadline of May 16, 2007, Plaintiffs filed an *Unopposed Motion to File First Amended Complaint* [Doc. 41], which the assigned Magistrate Judge granted the same day in a text-only *Order* [Doc. 42]. The next day, Plaintiffs filed their *First Amended Complaint* [Doc. 43] which added two new counts against each Defendant for failure to warn or provide directions for use. Both Defendants filed answers to the *First Amended Complaint*, with Defendant JLG again asserting a modification defense. [Doc. 45, 46.]

On June 15, 2007, the parties filed a second *Joint Motion to Extend Case Management Deadlines* on the grounds that the testing of the equipment, which previously had been

extended until the first week of May 2007, still had not been completed as of that date and could not resume until August 7, 2007, "because of the schedules of the experts." [Doc. 47, at 1-2.] In their *Joint Motion*, the parties specifically requested an extension of the discovery deadline until January 9, 2008, and an extension of the pretrial motions deadline until February 1, 2008; they did not, however, request an extension of the deadline for amending pleadings. [Doc. 47.]

On June 15, 2007, the assigned Magistrate Judge entered an *Agreed Order* [Doc. 48] granting the parties' second *Joint Motion to Extend Case Management Deadlines* [Doc. 47], which this Court set aside in a subsequent *Order* noting that the requested extensions fail "to properly address the need for a continuance of the scheduled pretrial conference and trial dates, because the parties' proposed deadline for dispositive motions and <u>Daubert</u> motions of February 1, 2008, will mean that such motions will not be fully briefed until the scheduled pretrial conference date, leaving the Court with insufficient time to make informed rulings on those motions in advance of the pretrial conference and trial dates." [Doc. 50.]   After a subsequent status conference with the parties, the Court entered additional orders granting the requested extensions of the case-management deadlines, but also setting a new pretrial conference date of May 6, 2008, and a new trial date of June 5, 2008. [Doc. 56, 57.] Again, there was no mention of extending the previously established deadline of May 16, 2007, for amending pleadings.

On September 25, 2007, Plaintiffs filed a *Motion for Partial Summary Judgment and Supporting Memorandum Brief* [Doc. 65] regarding the Defendants' alleged duty to warn

and provide directions for use, and the alleged breach of that duty.  In support of this motion, Plaintiffs submitted a copy of portions of Defendant JLG's "Operators and Safety Manual," along with an affidavit dated September 21, 2007, and a Rule 26 expert report dated August 27, 2007, both of which were authored by of one of Plaintiffs' expert witnesses, Dr. Charles L. Proctor.  [Doc. 65-2.]

In that affidavit and expert report, Dr. Proctor focused on a component of the scissor lift which he labeled the "drive speed cut-out switch."  This component is designed to serve as an interlock device which disables the controls for raising the four leveling jacks on the JLG 500 RTS Scissor Lift when the work platform is above its fully lowered position, and thereby prevents the lift from becoming unstable and tipping over.  If this cut-out switch fails to operate as designed, however, then Dr. Proctor opined that "the leveling jacks can be operated through unintentional activation of the leveling jack switches on the platform control station" while the work platform is in a raised position.  [Proctor Aff. 9-21-07, at 3.] Plaintiffs further allege that the "JLG Operators and Safety Manual" does not contain specific instructions or warnings explaining how the operation of the leveling jacks is related to the circuitry for the "drive speed cut-out switch."  [Proctor Aff. 9-21-07, at 3.]

Defendants requested additional time to respond to Plaintiffs' motion on the grounds that they had not yet had a fair opportunity to depose Plaintiffs' liability experts (including Dr. Proctor) and to obtain reports from their own liability experts, which were not due to be disclosed until October 10, 2007.  [Doc. 56, 68.]  After conducting a hearing and receiving affidavits pursuant to Fed. R. Civ. P. 56(f) [Doc. 73, 74, 77], the Court granted the requested

extension. [Doc. 147.] Accordingly, Defendant JLG's subsequent response brief [Doc. 132] filed on January 9, 2008, as well as Defendant United Rentals' subsequent response brief [Doc. 138] filed on January 15, 2008, were accepted as timely filed.

In their response briefs [Doc. 132, 138], Defendants asserted that Plaintiffs' motion was improper because it only concerns two elements of Plaintiffs' failure-to-warn claims (duty and breach), and therefore cannot provide a basis for summary judgment on either of those claims under Fed. R. Civ. P. 56. Defendants further asserted that facts concerning the alleged breach of a duty to issue more specific warnings about the "drive speed cut-out switch" are not material in this case because the results of discovery completed after the filing of Plaintiffs' motion (including Dr. Proctor's deposition transcript) show that the raising of the leveling jack which led to the accident was not caused by a failure of the component which Dr. Proctor referred to as the "drive speed cut-out switch." Rather, Defendant JLG asserted that the raising of the leveling jack was made possible by a subsequent modification to the wiring of the scissor lift which caused the cut-out switch's interlock mechanism to be bypassed. In the alternative, Defendant JLG asserted that even if facts pertaining to the "drive speed cut-out switch" were material to Plaintiffs' failure-to-warn claims, then those facts were disputed. [Doc. 132.]

By the time Defendants had completed discovery and filed their responses to Plaintiff's motion for partial summary judgment, a number of other disputes concerning discovery and case-management issues had arisen. First, on October 26, 2007, Plaintiffs filed an opposed *Motion for Leave to File Second Amended Complaint* [Doc. 83] asserting

new claims for punitive damages against both Defendants.  Defendants opposed Plaintiffs'
second motion to amend on the grounds that the proposed amendment adding claims for
punitive damages would be untimely, unfairly prejudicial, and futile.  [Doc. 91, 95.]

On October 31, 2007, while the above motions were still in the process of being
briefed, Defendant United Rentals filed a *Motion for Partial Summary Judgment* asserting
that Plaintiffs could not succeed on their negligence claim against Defendant United Rentals
because, as of that date, Plaintiffs had "not identified or disclosed an expert witness to testify
as to the standard of care, or the breach thereof, to inspect, repair or maintain the subject lift."
[Doc. 87, at 3.]  Defendant United Rentals also submitted an unsworn statement by their own
expert witness, George Saunders, Jr., as evidence that the required standard of care had in
fact been met.  [Ex. A to Doc. 87-2.]

In response to a subsequent motion filed by Defendant United Rentals, Plaintiffs
attached an additional report from their own expert, Dr. Proctor, dated November 8, 2007,
and served on November 9, 2007.  [Doc. 93, Ex. F to Doc. 106-2.]  On November 21, 2007,
Defendant United Rentals moved to strike that additional report by Dr. Proctor on the
grounds that it was untimely and did not comply with the Court's case-management
deadlines.  [Doc.  103.]  In response to Defendant United Rentals' motion, Plaintiffs
submitted a third report by Dr. Proctor dated December 7, 2007, which opines on the results
of additional testing ordered by the Magistrate Judge.  [Ex. B to Doc. 109.]

That additional testing was ordered in response to Plaintiffs' *Motion to Compel*
*Additional Inspection and Testing of the Accident Lift and Request for Expedited Hearing*

[Doc. 98] filed on November 12, 2007.   As a basis for the latter motion, Plaintiffs asserted that Dr. Proctor needed to conduct additional testing and inspection of the scissor lift involved in the fatal accident in order to respond to information regarding the modification defense that was disclosed in Defendant JLG's expert reports of October 10, 2007.   On November 16, 2007, the assigned Magistrate Judge entered an order which granted that motion and further extended the discovery deadline until January 18, 2008, in order to accommodate the additional testing and inspection by Plaintiffs' expert.

On January 18, 2008, when the discovery deadline finally passed after repeated extensions, Defendant JLG filed a *Motion to Assess Costs* associated with the additional testing conducted by Dr. Proctor on December 6, 2007.   [Doc. 145.]   Defendant United Rentals joined in Defendant JLG's motion. [Doc. 146.]  As grounds for imposing sanctions, both Defendants asserted that Plaintiffs' earlier motion for additional inspection and testing of the scissor lift was based on misrepresentations by Plaintiffs' counsel which Defendants never had a fair opportunity to rebut.  According to Defendants, Plaintiffs' counsel were untruthful to the Court when they stated that the additional inspection and testing they requested on November 12, 2007, was necessitated by their lack of information about Defendant JLG's modification defense and Defendants' failure to disclose adequate information about the facts relevant to that defense, *i.e.*, the modifications to the scissor lift's wiring that Defendant United Rentals allegedly performed.

To support the contention that these statements by Plaintiffs' counsel were untruthful, Defendant JLG cited the deposition testimony of Plaintiff's expert witness, Dr. Proctor,

which was taken on December 11, 2007.  In that deposition testimony, Dr. Proctor admitted that he observed and recognized the modification of the scissor lift's wiring during his initial inspection on May 1, 2007; he also admitted that he advised Plaintiffs' counsel of those modifications and the need to test them before he returned for the second round of testing and inspections on August 7, 2007.  Dr. Proctor further admitted in his deposition testimony that he intended to perform additional testing on August 7, 2007, in relation to the wiring modifications he had earlier observed, but that he simply forgot to do so.  Dr. Proctor also did not disclose his knowledge of the wiring modifications or opine on their significance in his initial expert report dated August 27, 2007.  [Proctor Dep., Ex. A to Doc. 145-2, at 6-13, 18-25,  30-65, 86-89.]

Plaintiffs' response to the *Motion to Assess Costs* [Doc. 156] repeats their earlier assertions that prior to the deadline for disclosing Defendant's expert reports on October 10, 2007, Defendants withheld information about the wiring changes that were relevant to Defendant JLG's modification defense and to the protocol for testing and inspecting the scissor lift involved in the accident.  Thus, according to Plaintiffs, Dr. Proctor did not realize the significance of the wiring modifications he had previously observed, nor did he recognize the omission in the prior testing as it relates to those modifications, until after he had received and reviewed the expert reports supplied by Defendants' experts.

On April 1, 2008, the assigned Magistrate Judge entered an *Order* [Doc. 198] granting in part and denying in part the Defendants' *Motion to Assess Costs*.  The Magistrate Judge found that Plaintiffs' counsel failed to fully advise the Court regarding the circumstances

surrounding the inspection at issue and awarded Defendant JLG sanctions in the amount of $5,120 in order to shift some of the costs of conducting the additional inspection.[2]

On the dispositive-motions deadline of February 1, 2008, the parties filed a number of additional motions seeking summary judgment and/or the exclusion of expert testimony under Fed. R. Evid. 702.  Defendant JLG moved for summary judgment on all of Plaintiff's claims based on the modification defense discussed above and the alleged inadmissibility of the opinions of Plaintiff's experts (Dr. Proctor and Vincent Gallagher), which JLG challenged in separate motions.  [Doc. 149, 154, 155.

In response to the motions to strike or exclude their experts' testimony, Plaintiffs submitted another affidavit by Dr. Proctor (this one dated February 18, 2008), as well as a supplemental affidavit by Mr. Gallagher.  [Ex. A to Doc. 164-2.]   Defendant JLG then moved to strike these opinions from Plaintiffs' experts, as well as the affidavit of lay witness James Magoffe.  [Doc. 184, 186, 187.]  Briefing on these motions was completed on April 15, 2008, only three weeks before the pretrial conference date of May 9, 2008.

## II.   **APPLICABLE LAW**

Before turning to the merits of the parties' motions, the Court first must determine the extent to which this litigation is governed by state or federal law.  Federal courts generally apply state substantive law and federal procedural law in a diversity action.  See Hanna v. Plumer, 380 U.S. 460 (1965).  "For example, state law defines the elements and defenses of

---

[2]The Magistrate Judge awarded an additional $756.80 in costs in a subsequent *Order* [Doc. 206] after receiving documentation regarding the airfare costs for one of Defendant JLG's experts.

a cause of action in a diversity case." Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 882

(10th Cir. 2006).  And the Court applies the Federal Rules of Evidence and the Federal Rules

of Civil Procedure, taken in the context provided by the substantive state law.  See id. at 879-

83; Blanke v. Alexander, 152 F.3d 1224, 1231 (10th Cir.1998).

        The process for litigating the parties' motions for summary judgment is governed by

Federal Rule of Civil Procedure 56, see Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517,

522-23 (3d Cir. 2004), and the admissibility of expert testimony is governed by Federal Rule

of Evidence 702, see Stutzman v. CRST, Inc., 997 F.2d 291, 295 (7th Cir. 1993).  Both of

these rules are concerned with promoting "'accuracy, efficiency, and fair play in litigation.'"

Sims, 469 F.3d at 882 (quoting Michael Lewis Wells, The Impact of Substantive Interests

on the Law of Federal Courts, 30 Wm. & Mary L. Rev. 499, 504 (1989)).  Thus, they fall

within the scope of the federal procedural law that remains applicable in a diversity action.

## III.   STANDARD OF REVIEW

        Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion

papers, affidavits, and other evidence submitted by the parties show that no genuine issue

exists as to any material fact, and that the moving party is entitled to judgment as a matter

of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that

a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it

might affect the outcome of the case.  See id. at 248.

When the movant is also the party bearing the burden of persuasion on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir.  1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.  "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision,

Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue." Burns v. Bd. of County Comm'rs., 330 F.3d 1275, 1282 (10th Cir. 2003); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986). In determining whether an affidavit constitutes an attempt to create a sham fact issue, the Court considers (1) whether the affiant was cross-examined during his earlier testimony, (2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and (3) whether the earlier testimony reflects confusion which the affidavit attempts to explain. See Franks, 796 F.2d at 1237; Burns, 330 F.3d at 1282.

In this case, the parties have submitted exhibits and testimony that contain hearsay. In reviewing these materials to determine whether a party is entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed. See Fed. R. Evid. 801(d)(2); Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). The Court does, however, consider statements attributed to third parties for other admissible purposes. In particular, such statements may be considered for the limited purpose of showing their

-14-

effect on the listener or the declarant's state of mind.  See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from such limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

## IV.   DEFENDANT JLG'S MOTION FOR SUMMARY JUDGMENT

On February 1, 2008, Defendant JLG moved for summary judgment on all of Plaintiffs' claims.  Central to Defendant JLG's motion is a "substantial modification" defense premised on evidence that Defendant United Rentals' employees disobeyed Defendant JLG's warnings and directions by modifying the wiring of the scissor lift without Defendant JLG's knowledge or consent in a manner that caused the "drive speed cut-out switch" or interlock device to be bypassed, thereby allowing the scissor lift's leveling jacks to be retracted while the work platform was elevated approximately 50 feet off the ground.  Plaintiffs assert that

-15-

this defense does not apply to failure-to-warn or failure-to-instruct claims, and that there are

disputed issues of material fact concerning the element of causation.

As a procedural matter, the Court notes that Defendant JLG's motion attaches expert

reports containing unsworn statements which "'do[ ] not meet the requirements of Fed. Rule

Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary

judgment motion."  Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting

Adickes v. S.J. Kress & Co., 398 U.S. 144, 158 n.17 (1970)); accord Fowle v. C & C Cola,

868 F.2d 59, 67 (3d Cir. 1989); see Sofford v. Schindler Elevator Corp., 954 F. Supp. 1459,

1462-63 (D. Colo. 1997) (collecting cases).  In this instance, however, the inadmissibility of

these unsworn statements is not dispositive because Plaintiffs have admitted most of the

undisputed facts listed in Defendant JLG's motion pursuant to the procedure stated in

D.N.M. LR-Civ. 56.1(b), which provides that:  "All material facts set forth in the statement

of the movant will be deemed admitted unless specifically controverted."  [Doc. 168, at 2;

see also Doc. 106, at 6-9.]  Plaintiffs' liability expert, Dr. Proctor, also has admitted many

of the same or similar facts in his deposition testimony.  [Doc. 154-2.]

Apart from these procedural and evidentiary considerations, the Court applies the

substantive law of the State of New Mexico to Defendant JLG's motion, as reflected in the

New Mexico Uniform Jury Instructions (NMUJI) and reported case law from the State's

appellate courts.  New Mexico adopted the principle of strict products liability based on the

Restatement (Second) of Torts § 402A (1965) in Stang v. Hertz Corp., 83 N.M. 730, 732,

497 P.2d 732, 734 (1972).  See Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶ 12,

131 N.M. 87, 33 P.3d 638; <u>Martin v. Unit Rig & Equip. Co.</u>, 715 F.2d 1434, 1439 (10th Cir. 1983) (collecting cases).  This principle has been further developed in the <u>Restatement (Third) of Torts: Products Liability</u> § 1 (1997). <u>See, e.g.</u>, <u>Spectron Development Laboratory v. American Hollow Boring Co.</u>, 1997-NMCA-025, ¶ 13, 123 N.M. 170, 936 P.2d 852.

The introduction to Chapter 14 of New Mexico's Uniform Jury Instructions also explains how such a strict products liability theory can be paired with a negligence claim. A negligence claim is premised on the notion that "[t]he supplier of a product has a duty to use ordinary care to avoid a foreseeable risk of injury caused by a condition of the product or manner in which it is used."  NMUJI 1402.  This duty continues after the product has left the supplier's possession, and thus "[a] supplier who later learns, or in the exercise of ordinary care should know, of a risk of injury caused by a condition of the product or manner in which it could be used must then use ordinary care to avoid the risk."  <u>Id.</u>

In contrast, a strict products-liability theory does not depend on the degree of care exercised by the supplier.  The focus is instead on the risk of injury that the product itself presents.  Thus, "[u]nder the strict products liability theory, a supplier of products is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use."  <u>Smith</u>, 2001-NMCA-090, ¶ 13 (citing NMUJI 13-1406).  "An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable."  <u>Id.</u> (citing NMUJI 13-1407).  Such a risk of injury may arise from a feature of the product itself (*e.g.*, the absence of a reasonable alternative design), as well as a failure to provide adequate warnings or directions for its use.

See NMUJI 13-1415 (duty to provide adequate warnings), 13-1416 (duty to provide adequate directions for use).

The fact that a third party made post-sale modifications to a product which affected its safety does not provide a discrete, stand-alone defense to a products-liability theory. See Restatement (Third) of Torts, supra §17, cmt. c, at 258. Rather, such post-sale modifications may be relevant to determining whether a product was defective at the time of sale, whether such a defect was a proximate cause of the claimed injury, and whether damages should be apportioned according to principles of comparative responsibility.[3] See id. § 2, cmt. p, at 38.

Post-sale modifications may be relevant to determining whether the product was defective at the time of sale, because "[s]uppliers are responsible for risks arising from foreseeable uses of the product, including reasonably foreseeable unintended uses and misuses." Smith, 2001-NMCA-090, ¶ 17 (citing UJI 13-1403). If the post-sale modifications were reasonably foreseeable to the product's supplier, then the supplier's failure to adequately protect against the risks entailed by those modifications, through an alternative design or warning, may support a finding that the product was defective or posed an unreasonable risk of injury at the time of the sale. See id.

---

[3] Because Defendant JLG's motion for summary judgment focuses on issues of liability (such as duty, breach, and causation), the Court does not further discuss the how the substantial-modification defense may affect the issue of apportioning damages according to principles of comparative responsibility. Viewing the evidence in the light most favorable to Plaintiffs, the Court assumes for purposes of analysis that such apportionment of damages would not be dispositive of Defendant JLG's motion for summary judgment, regardless of what percentage of responsibility for the accident is attributed to Plaintiffs or their employer.

Under New Mexico's summary-judgment procedure, the State's courts usually leave questions about the foreseeability of unintended post-sale misuse of a product for the jury to decide at trial.[4] <u>See, e.g.</u>, <u>Smith</u>, 2001-NMCA-090, ¶ 14.  On the other hand, there are cases where the post-sale use or modification of a product is so unforeseeable that the matter can be taken from the jury.  <u>See</u> <u>id.</u> ¶ 17.  "'In retrospect, almost nothing is entirely unforeseeable.  A test of foreseeability, however, does not bring within the scope of a defendant's liability every injury that might possibly occur.  Foreseeability has been defined . . . as that which is *objectively reasonable* to expect, not merely what might conceivably occur.'"  <u>Van de Valde v. Volvo of Am. Corp.</u>, 106 N.M. 457, 459, 744 P.2d 930, 932 (Ct. App. 1987) (quoting <u>Mata v. Clark Equip. Co.</u>, 374 N.E.2d 763, 766  (Ill. 1978)).  This requirement of objective reasonableness provides a basis for the Court to conclude, as a matter of law, that certain risks entailed by post-sale modifications are too unforeseeable to establish a defect or unreasonable risk of injury in the product itself or in the existing warnings and directions that accompany it at the time of sale.

Post-sale modifications of a product also can affect the issue of causation insofar as such modifications may constitute an independent intervening cause of a plaintiff's injuries.  <u>See</u> <u>Restatement (Third) of Torts</u>, <u>supra</u>, § 15 cmt. b (citing <u>Dugan ex rel. Dugan v. Sears,</u>

---

[4]The Court notes that New Mexico's summary-judgment procedure differs from Fed. R. Civ. P. 56 in some respects.  For example, New Mexico's procedure only requires non-movants to show a disputed factual issue concerning a single element of their claim.  <u>See</u> <u>Bartlett v. Mirabal</u>, 2000-NMCA-036, ¶ 17, 128 N.M. 830, 999 P.2d 1062.  Accordingly, opinions from state courts that resolve products-liability claims based on differences between federal and state procedure may be inapposite in the context presented here.

Roebuck & Co., 454 N.E. 2d 64, 67 (Ill. App. 1983)).   New Mexico law defines

"independent intervening cause" as "that which interrupts the natural sequence of events

which could reasonably be expected to result from the condition in which a product was sold

or from a foreseeable manner of use.  An independent intervening cause unforeseeably turns

aside the course of events and produces a result which could not reasonably have been

expected."   NMUJI 13-1424.   Thus, the definition of independent intervening cause

incorporates the notion of foreseeability discussed above.

New Mexico's Uniform Jury Instructions provide specific guidance on how the issue

of causation is to be treated when there is evidence that a product was changed or altered and

that such change or alteration was a cause of the claimed injury:

> In order for a supplier . . . to be liable, the injury must have been caused
> by a condition of the product which was not substantially changed from the
> condition in which the . . . supplier placed the product on the market or in
> which the supplier could have reasonably expected it to be used.

> For a substantial change in the product to relieve a supplier of liability,
> the change itself must be a cause of the harm done.

NMUJI 13-1422.  The directions for use of this instruction indicate that it must be given only

when a defendant meets its burden of producing sufficient evidence that there was a change

or alteration of the product which was a cause of the plaintiff's injury.  See id.  But in this

case, there is no question that Defendant JLG has met its burden of producing such evidence

in light of Plaintiffs' admissions in response to the statement of undisputed facts in

Defendant JLG's motion for summary judgment.  Thus, under New Mexico's products-

liability instructions, and particularly the committee comment regarding the definition of

"independent intervening cause," Plaintiffs still bear the ultimate burden of persuasion as to the element of causation.  See NMUJI 13-1424; State Farm Fire & Cas. Co. v. Miller Metal Co., 83 N.M. 516, 518, 494 P.2d 178, 180 (Ct. App. 1971).

New Mexico's Uniform Jury Instructions also provide specific guidance on how the absence of adequate warnings or directions affects the issue of causation:  "If, in light of all the circumstances of this case, [an adequate warning] [adequate directions for use] would have been noticed and acted upon to guard against the danger, a failure to give [an adequate warning] [adequate directions for use] is a cause of injury."  NMUJI 13-1425.  An adequate warning or direction is defined as one having the following characteristics:

>    (1)  It must be in a form that can reasonably be expected to catch the attention of the reasonably foreseeable user of the product;

>    (2)  It must be understandable to the reasonably foreseeable user of the product; and

>    (3)  It must disclose the nature and extent of the danger.  In this regard, there must be specified any harmful consequence which a reasonably foreseeable user would not understand from a general warning of the product's danger [or] from a simple directive to use or not to use the product for a certain purpose or in a certain way.

NMUJI 14-1418.  The Directions for Use of NMUJI 13-1425 indicate that, when supported by the evidence, the failure-to-warn instructions are to be given in addition to, and not as a replacement for, the general instruction on causation stated in NMUJI 13-1424.

There are circumstances in which a substantial modification may preclude a plaintiff from proving the elements of a design-defect theory without precluding a failure-to-warn theory.  A classic example is provided in Liriano v. Hobart Corp., 700 N.E.2d 303, 305 (N.Y.

Ct. App. 1998), where the defendant provided a safety guard to prevent users from getting their hands caught in a meat grinder, but did not provide any warning "to indicate that it was dangerous to operate the machine without the safety guard in place." On these facts, a third party's removal of the safety guard constituted a substantial modification that precluded the defendant's liability on a design-defect theory. See id. at 305-06. But since there was evidence that the defendant knew a significant number of users were removing the safety guard, the Liriano court concluded that such removal was a foreseeable modification or misuse of the product that the defendant had a duty to warn against. See id. at 307-08.

The Liriano court also emphasized, however, that there may be different circumstances in which a substantial modification would preclude a defendant's liability on *both* a design-defect theory *and* a failure-to-warn theory. See id. at 308. If, for example, the defendant had provided *both* a safety guard on its product *and* a warning directing users not to remove the safety guard, then at some point it would become superfluous and counter-productive to require additional warnings. "Requiring too many warnings trivializes and undermines the entire purpose of the rule, drowning out cautions against latent dangers of which a user might not otherwise be aware. Such a requirement would neutralize the effectiveness of warnings as an inexpensive way to allow consumers to adjust their behavior based on knowledge of a product's inherent dangers." Id. at 308; accord Restatement (Third) of Torts, supra § 2, cmt. i.

In my view, the present case involves a similar relationship between the safety features of the product at issue and the warnings or directions provided with it. It is

undisputed that Defendant JLG designed, manufactured, and sold the scissor lift at issue here with an interlock device called a "drive speed cut-out switch" that interrupts the electrical circuit to the leveling-jack controls so that they cannot cause the jacks to extend or retract when the platform had been raised from its fully lowered position. This interlock device is analogous to the safety guard at issue in Liriano, the purpose and function of which was defeated through substantial modifications to the product made by a third party.

But unlike the defendant in Liriano, there is evidence that Defendant JLG took the additional step of providing warnings or directions telling buyers or users of the scissor lift not to modify it without the manufacturer's written permission, and not to operate it if the "high drive speed, high engine speed, and high pump speed functions operate when [the] platform is raised above the stowed position." [Doc. 132-4.] Thus, Defendant JLG provided *both* a safety feature on the scissor lift itself *and* an integrated set of warnings or directions telling buyers or users not to make unauthorized modifications. As discussed in the *Memorandum Opinion and Order* filed concurrently herewith concerning Plaintiffs' negligence claim against Defendant United Rentals, there is evidence that the safety features and warnings provided by Defendant JLG were integrated so that the "high drive speed, high engine speed, and high pump speed functions" could serve as the proverbial "canary in the coalmine" by signaling to users that something was amiss with the equipment without requiring users to risk putting themselves in danger by physically manipulating the leveling-jack controls in order to confirm whether or not they were operational while the work platform was elevated. [Doc. 132-4.]

The question then becomes whether it was reasonably foreseeable to Defendant JLG that someone would disobey the manufacturer's directions, extensively modify the scissor lift without its knowledge or consent so as to bypass the interlock device, and then use the lift in such a modified condition without any warning that the equipment had been modified. The Liriano court concluded that a duty to warn against such a possibility "will generally arise where a defect or danger is revealed by user operation and brought to the attention of the manufacturer." Id. at 307.  But in this case, there is no evidence in the record to support a reasonable inference that Defendant JLG knew or should have known  the buyers or users of its scissor lifts were modifying the wiring so as to bypass the interlock device and then operating the lift without this important safety feature.  See Scardefield v. Telsmith, Inc., 699 N.Y.S.2d 235, 237-38 (N.Y. App. Div. 1999) (distinguishing Liriano where the manufacturer did not have reason to know of the modifications).

Moreover, the type of modifications at issue in the case at bar are much more extensive than the simple act of removing the guard or shield on the outside of the meat grinder at issue in Liriano.  In this regard, the undisputed facts reflect that those responsible for the post-sale modifications at issue in this case had to make a series of deliberate additions to several components of the scissor lift in order to defeat the interlock device and cause the leveling-jack controls to become operational while the work platform was elevated.

First, the wiring in the ground terminal was cut and spliced to make Terminal No. 24 "hot" or energized any time the ignition was on.  Then a pin was added to the platform control box at Location W, and a brown wire with blue markings was added to connect this

modified pin with the now-energized Terminal No. 24.  Finally, the wiring inside the platform control box was modified so as to connect the newly spliced pin at Location W with the toggle switches that controlled the leveling jacks.  [Doc. 149, at 5-6.]

The inspection of the scissor lift involved in the accident also revealed other anomalous modifications.  For example, the cable connectors running from the ground terminal also were altered so as to have two female connectors attached to two male connectors at the platform control box, rather than one male and one female as originally designed.  [Doc. 149, at 6.]  In addition, a green light on the platform control box that is designed to switch on when the leveling jacks are set was disconnected.  [Doc. 106, at 8-9.]

These facts concerning the modifications described above are admitted pursuant to D.N.M. LR-Civ. 56.1 in Plaintiffs' response to the statement of undisputed facts on pages 3 through 6 of Defendant JLG's motion for summary judgment. [Doc. 149.]  Many of them also are asserted in Plaintiffs' response to Defendant United Rentals' motion for partial summary judgment on Plaintiffs' negligence claim [Doc. 106] and admitted in Dr. Proctor's deposition testimony.  [Doc. 154-2.]  Plaintiffs have not identified any evidence in the record to suggest that the above modifications were made with Defendant JLG's written permission as directed in the manuals for the scissor lift.  On the contrary, Plaintiffs have cited the relevant ANSI standard and pointed to the *absence* of such evidence concerning Defendant United Rentals' compliance with Defendant JLG's existing warnings and directions.  [Doc. 106, at 10.]

The undisputed facts concerning the extent of the post-sale modifications to the scissor lift and the disregard of existing warnings and directions supplied by Defendant JLG support the inference that the risks entailed by these post-sale modifications were not reasonably foreseeable to Defendant JLG as a matter of law.  See Van de Valde, 106 N.M. at 459, 744 P.2d at 932; Scardefield, 699 N.Y.S.2d at 237-38.  Insofar as Defendant JLG could not have reasonably expected its scissor lift to be used in this extensively modified condition, such modifications also may relieve Defendant JLG of liability under the principles of causation expressed in NMUJI 13-1422 and the illustrations to the Restatement (Third) of Torts, supra § 2, at 232.

Under the first of these illustrations, the manufacturer of a defective product is not liable for injuries "which would have occurred even if the defect had not been present."  Id. Thus, even if the interlock device for the scissor lift involved in the accident was defective, such that it did not prevent the leveling jacks from operating when the work platform was elevated, Defendant JLG is not liable under the undisputed facts presented here because the leveling jacks would have operated anyway due to the extensive post-sale modifications which bypassed the interlock device, regardless of whether it was in an open or closed position.

Under the second illustration in the Restatement, the manufacturer of a defective product is not liable for injuries where another party's "modification and subsequent failure to effect adequate repair were sufficiently unforeseeable that the defect was not a substantial factor in causing the . . . injury," even though the defect was "a necessary condition to the

occurrence of the accident."  Id.  Thus, even if Defendant United Rentals had recognized a manufacturer's defect in the scissor lift's interlock device and attempted to repair it, Defendant United Rentals' failure to perform an adequate repair and failure to warn subsequent users of the inadequacy of its repair would be sufficiently unforeseeable to Defendant JLG that Plaintiffs could not meet their burden of proof as to the element of causation with respect to their claims against Defendant JLG.

## V.   ADMISSIBILITY OF OPINION EVIDENCE CITED IN RESPONSE TO DEFENDANT JLG'S MOTION FOR SUMMARY JUDGMENT

To overcome the dearth of evidence concerning the foreseeability of the scenario that led to the fatal accident at issue in this case, Plaintiffs rely on the opinions of their expert witnesses, Dr. Proctor and Mr. Gallagher, as well as the opinion of Plaintiff James Magoffe and certain statements taken from Defendants' witnesses.  On a number of procedural and evidentiary grounds, Defendant JLG has moved to strike or exclude such opinions.  [Doc. 154, 155, 186, 187.]  The Court is required to address such motions as part of its gatekeeping function under Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).  Accordingly, the focus of the Court's analysis shifts at this juncture from the substantive law of the State of New Mexico to the requirements of federal procedural law regarding the admissibility of opinion evidence submitted in the context of a response to a motion for summary judgment.

For purposes of determining whether Defendant JLG is entitled to summary judgment, several of Defendants' objections are moot because, as the Court has previously noted,

unsworn statements in an expert's report do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot form the evidentiary basis for a district court's ruling on a summary judgment motion.  See Carr, 338 F.3d at1273 n.26.  Therefore, even if they are not stricken on other grounds, the following documents authored by Plaintiffs' experts cannot independently serve to provide admissible evidence in support of Plaintiffs' arguments against Defendant JLG's motion for summary judgment:

      1.  Dr. Proctor's initial expert report disclosed on August 29, 2007, [Doc. 63] and subsequently attached to the briefing on the parties' motions [Doc. 65-2; Doc. 98-2; Ex. D to Doc. 158-2; Ex. A to Doc. 163-2; Ex. B to Doc. 164-2; Ex. A to Doc. 192-2];

      2. Dr. Proctor's "rebuttal report" disclosed on November 9, 2007, [Doc. 93], and subsequently attached to the briefing on the parties' motions [Ex. F to Doc. 106-2;  Doc. 109; Ex. 3 to Doc. 160-2; Ex. E to Doc. 163-2;  Ex. B to Doc. 192-3];

      3.  Dr. Proctor's "supplemental report" concerning additional testing dated December 7, 2007, and subsequently attached to the briefing on the parties' motions [Ex. H to Doc. 164-3; Ex. C to Doc. 192-4];

      4.  Mr. Gallagher's initial expert report disclosed on August 29, 2007, [Doc. 63] and subsequently attached to the briefing on the parties' motions [Doc. 155-2; Ex. 5 to Doc. 161-2; Ex. 2 to Doc. 193-3];

      5.  Mr. Gallagher's "supplemental report" disclosed on November 9, 2007,  [Doc. 92] and referenced in Defendant JLG's motion to exclude Mr. Gallagher's testimony [Doc. 155-3].

The Court will, however, occasionally refer to the above documents in its analysis insofar as they contain facts or data which form a basis under Fed. R. Evid. 703 for opinions expressed elsewhere in sworn affidavits or deposition testimony.  Under Fed. R. Evid. 104(a), the Court's preliminary rulings on the admissibility of the opinions contained in such

affidavits or deposition testimony may take into account the facts or data on which those opinions are based, even if the documents containing those facts or data are not independently admissible.

The evidence of record contains the following affidavits and deposition transcripts pertaining to Plaintiffs' liability experts which are not subject to the same hearsay objection that applies to their unsworn expert reports:

> 1.   Dr. Proctor's first affidavit dated September 21, 2007, that is attached to Plaintiffs' motion for partial summary judgment [Doc. 65-2];

> 2.   Dr. Proctor's deposition transcript dated December 11, 2007, excerpts of which are attached to the briefing on the parties' motions [Doc. 132-2, Doc. 145-2; Ex. A to Doc. 150-2; Doc. 152-2; Doc. 154-2; Ex. D Doc. 156-2; Ex. 1 to Doc. 160-2; Ex. C to Doc. 164-2; Doc. 187-3];

> 3.   Dr. Proctor's second affidavit dated February 18, 2008, [Ex. A to Doc. 164-2] that is attached to Plaintiffs' *Response in Opposition to JLG's Motion to Exclude Opinions of Charles Proctor* [Doc. 164];

> 4.   Mr. Gallagher's deposition transcript dated November 30, 2007, excerpts of which are attached to the briefing on the parties' motions [Doc. 132-3; Doc. 155-5; Ex. 3 to Doc. 161-2; Ex. 1 to Doc. 193-2; Ex. A to Doc. 202-2]; and

> 5.   Mr. Gallagher's affidavit dated February 18, 2008, [Ex. 1 to Doc. 161-2] that is attached to  to Plaintiffs' *Response in Opposition to Defendant JLG Industries, Inc.'s Motion to Exclude Testimony of Vincent Gallagher.* [Doc. 161.]

The Court will first address Dr. Proctor's affidavits and deposition testimony in chronological order, and then turn to the sworn testimony of Mr. Gallagher and the other witnesses referenced in Plaintiffs' response to Defendant JLG's motion for summary judgment.

### A.      Dr. Proctor's First Affidavit Dated September 21, 2007

Dr. Proctor's affidavit dated September 21, 2007, is based on the facts or data set forth in his initial expert report disclosed on August 29, 2007, which was submitted by the date required under the Court's most recent *Order* [Doc. 56] extending case-management deadlines.  Therefore, the Court will not exclude this affidavit on grounds that it is untimely.

I nevertheless conclude that the expert opinions set forth in Dr. Proctor's affidavit dated September 21, 2007, do not meet the requirements for admission under Fed. R. Evid. 702 as articulated in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), and Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The purpose of this rule is "to ensure that the evidence is both 'reliable' and 'relevant.'"  Truck Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1210 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 589).  Factors to be considered in assessing the reliability of an expert opinion include, but are not limited to:  "(1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community."  Id. (citing Daubert, 509 U.S. at 590).

Rule 702 was amended in 2000 to state as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The 2000 amendments more explicitly state that to be admissible in federal court, expert opinions require not only a reliable methodology but also a sufficient factual basis and a reliable application of the methodology to the facts. See Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007); United States v. Mamah, 332 F.3d 475, 477-78 (7th Cir. 2003).

A "sufficient factual basis" under Fed. R. Evid. 702 does not necessarily require the facts or data upon which an expert bases his or her opinion to be independently admissible, so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. In this case, the Court finds that an expert's affidavit or deposition testimony may reasonably rely on facts or data set forth in an expert report that was previously disclosed in accordance with the requirements of Fed. R. Civ. P. 26(a)(2)(B). Thus, it is permissible for Dr. Proctor's affidavit dated September 21, 2007, to cite or refer to facts or data contained in his initial expert report that was previously disclosed on August 29, 2007, even though the unsworn statements in that expert report are not independently admissible.

The basic methodology or technique behind Dr. Proctor's affidavit of September 21, 2007, as well as his initial expert report disclosed on August 29, 2007, may be "characterized as a process of reasoning to the best inference," _i.e._, "a process of eliminating possible causes as improbable until the most likely one is identified." Bitler v. A.O. Smith Corp., 400 F.3d

1227, 1237 (10th Cir. 2004). The Tenth Circuit has recognized the reliability of this methodology in an engineering context so long as the following requirements are met. To begin with, "the inference to the best explanation must first be in the range of possible causes," meaning that "there must be some independent evidence that the cause identified is of the type that could have been the cause." Id. Next, the expert "must provide objective reasons for eliminating alternative causes." Id. Finally, "an inference to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." Id. at 1238.

The problem with the reasoning in Dr. Proctor's first affidavit is that it does not reliably apply these principles and methods to the facts of this case and is not based upon sufficient facts or data, as required by Rule 702. This affidavit also fails under the Daubert analysis because the opinions expressed therein were not subject to a sufficient degree of testing. See Johnson, 484 F.3d at 429-33.

As noted in Dr. Proctor's subsequent deposition testimony of December 11, 2007 [Proctor Dep. at 8-24, 30-63], and in the briefing on the parties' motions regarding the additional testing performed on December 6, 2007 [Doc. 98, 145, 146], Dr. Proctor omitted an important element of his testing of the scissor lift involved in the accident during the first two rounds of inspection that occurred in May 2007 and August 2007. Thus, he was under the mistaken impression that functional testing of the circuitry associated with the interlock device or "drive speed cut-out switch" had been performed prior to the disclosure of his first initial expert report in August 2007, when in fact such testing had not yet occurred.

This mistake or omission is critical to the reliable application of Dr. Proctor's methodology, because it means that he has failed to eliminate, through additional testing, the probability that the retraction of the leveling jack which caused the accident was enabled by other possible sources (such as the extensive modifications to the wiring of the ground terminal, cable connectors, and platform control box), rather than a failure of the "drive speed cut-out switch assembly" as designed by Defendant JLG.   Indeed, Dr. Proctor's first affidavit and initial expert report omit any discussion of these modifications.   His initial expert report also affirmatively states that "[a]ll systems related to the operation of the leveling jacks were examined" and that  "all operational systems for the leveling jacks were shown to operate correctly with the exception of the Drive Speed Cut-Out Switch assembly." [Doc. 65-2, at 25.]  And while Dr. Proctor's initial expert report acknowledges his review of a maintenance work order indicating that Defendant United Rentals had performed repairs on the scissor lift's wiring, it does not identify any modifications to that wiring or call for any additional investigation of Defendant United Rentals' repair work.  [Doc. 65-2, at 25.]

Dr. Proctor subsequently admitted in  his deposition testimony that the wiring on the scissor lift involved in the accident has been extensively modified so as to bypass the "drive speed cut-out switch" and make the leveling-jack controls operational even when the work platform is raised.  [Proctor Dep. at 30-63.]   In addition, he subsequently opined that Defendant United Rentals was responsible for making these modifications and did so without Defendant JLG's written permission.  [Ex. F to Doc. 106-2.]  Apart from the extensive modifications to the scissor lift's wiring, Dr. Proctor provided no basis in his deposition

testimony for concluding that there was any failure or defect in the "drive speed cut-off switch" itself.  [Proctor Dep. at 60-63.]  These admissions undermine the reliability of Dr. Proctor's affidavit of September 21, 2007, and the initial expert report on which that affidavit is based.

These subsequent developments also render Dr. Proctor's initial expert report and affidavit largely irrelevant and unhelpful to the trier of fact.  "'When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.'" General Motors Corp. v. Harper, 61 S.W. 3d 118, 130 (Tex. Ct. App. 2001) (quoting Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995)).  In this case, Dr. Proctor's initial expert report and affidavit are based on the assumption that all operational systems (including "electrical control circuits") for the leveling jacks were "shown to operate correctly."  [Doc. 65-2, at 25.]  Additional testing of the scissor lift has proven this assumption to be false, as it is now undisputed that there were numerous modifications to the ground terminal, the cable connectors, and the platform control box which were not operating in the manner designed by Defendant JLG.

It follows that the opinions stated in Dr. Proctor's affidavit of September 21, 2007, are irrelevant insofar as they were based on the undisputably false assumptions stated in his initial expert report disclosed on August 29, 2007.  Having failed to meet either the relevance or reliability components of the Court's Daubert analysis, these documents are inadmissible

and therefore cannot be relied upon to support Plaintiffs' response to Defendant JLG's motion for summary judgment.

### B.    Dr. Proctor's Deposition Testimony of December 11, 2007

I next turn to the question whether any of the opinions stated in Dr. Proctor's deposition testimony of December 11, 2007, are admissible for the purpose of supporting Plaintiffs' response to Defendant JLG's motion for summary judgment.  As noted above, the portions of Dr. Proctor's deposition testimony that are excerpted and attached to Defendant JLG's motion papers do little to advance Plaintiffs' claims against Defendant JLG insofar as they consist of admissions to the effect that the factual basis for the prior opinions stated in his first affidavit and initial expert report were unfounded or incomplete.

Nevertheless, when asked at his deposition whether "there are any changes that need to be made in those reports that you've produced," Dr. Proctor stated that:

> The only change that would be made would be on the original report where I referred to "the switch," and it should be referred to as "the switch assembly," and then that would clarify the misunderstanding that I had from the original testing in August regarding whether the functional test was correct.
>
> And so the fundamental theory of circuit analysis still holds, but it's not just the switch.  It would be the switch circuit which we now know was bypassed.  Other than that, no, there wouldn't be any other changes.

[Proctor Dep. at 136.] Specifically, Dr. Proctor's deposition testimony maintains the position that a "single point failure design and the bypass of the drive speed cut-out [switch] resulted in the deaths of Mr. Magoffe and Mr. Michel."  He explained that the "single point failure design" was revealed by the "circuit analysis on the interlock system" which "creates an

environment where a single component failure can create a single point critical condition." He identified the "single component" as the "drive speed cut-out switch assembly," even though he didn't have "any evidence that the drive speed cut-out switch failed." [Proctor Dep. at 143.]

The explanation of Dr. Proctor's theory of "circuit analysis" or "single point failure design" provided in his deposition testimony does not meet the requirements for admissibility under Fed. R. Evid. 702 or Daubert. "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." Bitler, 400 F.3d at 1233 (citing General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Such a gap is present in the deposition testimony cited above because it does not lay out the intermediate steps in Dr. Proctor's reasoning that lead him to conclude that his theory of "circuit analysis" or "single point failure design" can be reliably applied to the design of Defendant JLG's scissor lift notwithstanding the extensive post-sale modifications' to the scissor-lift's wiring.

According to Dr. Proctor's theory, a "Failure Modes, Effects and Criticality Analysis (FMECA)" of Defendant JLG's scissor lift would have revealed "the safety consequences of the failure of components or systems," including "design flaws, such as single point failure risks in life critical components and systems." [Ex. A to Doc. 65-2, at 26.] But his deposition testimony fails to set forth the steps in his reasoning which lead him to conclude that extensive post-sale modifications to *multiple* components of the scissor lift (including

the addition of splices, wires, and/or pins to the ground terminal, the cable connectors, and the platform control box) can be considered a *single point* failure that Defendant JLG could have reasonably foreseen and guarded against with additional, redundant safety features.

Dr. Proctor's reasoning also omits any discussion of other existing safety features which are designed to prevent improper retraction of the leveling jacks and tip-over accidents. For example, Plaintiffs have cited deposition testimony from one of Defendant JLG's experts, Dr. Francis Wells, which explains the existing warnings and testing protocol for determining whether the "high drive speed," "high engine speed," and "high pump speed" functions" continue to operate when the work platform is raised. According to the cited portion of Dr. Well's testimony, the post-sale wiring modifications had the effect of defeating the existing warning and testing protocol for the "high drive speed" function, but the "high engine speed" function still could provide an indication that the equipment was not functioning correctly. [Wells Dep. at 117-20, Ex. I to Doc. 164-3.]

One of Defendant JLG's employees, Stephen Forgas, testified at his deposition on September 12, 2007, that the scissor lift in question is equipped with a "lift cutout switch" as well as a "drive cutout switch" and a "high drive speed cutout switch." The "lift cut-out switch" functions independently to keep the work platform from being elevated above 22 feet unless the leveling jacks are properly set. [Forgas Dep. 9-12-07, at 35-37, Ex. F to Doc. 164-3.] The platform control box also contains a green light to indicate when the leveling jacks are extended and set, and there is a "tilt alarm" to warn users when the chassis of the scissor

lift is on a severe slope with the work platform raised.  [Proctor Dep. at 183-85; Blotter Dep. at 28-32,  Ex. E to Doc. 164-3.]

The evidence of record further indicates that the scissor lift contains a number of features designed to reduce the risk that the leveling-jack controls will be moved inadvertently.  For example, the toggle switches for the leveling jacks are placed in a recessed area on the side of the platform control box, rather than on the exposed top of the platform control box.  In addition, the toggle switches are designed to automatically return to their center or "off" position when not in use, and there is a specific warning directing users not to operate the machine if these toggle switches do not return to the "off" position when released.  [Ex. A to Wihl Aff. 9-24-07, Doc. 65-2.]  Finally, there is an emergency shut-off switch as well as a number of existing warnings and directions which pictorially depict the danger of tip-over accidents and warn against modifying the scissor lift without the manufacturer's written permission.  [Doc. 132-4.]

Dr. Proctor's deposition testimony fails to reliably explain how the retraction of the leveling jack that led to the tip-over accident in this case can be properly characterized as a "single-point failure" in light of the multiple safety features which had to be disabled, disregarded, or bypassed in order for this accident to occur.  Without accounting for these features, Dr. Proctor's testimony does not meet the requirements that the Tenth Circuit has articulated for reliably applying the methodology of "reasoning to the best inference." Bitler, 400 F.3d at 1237-38.

The record also reflects a number of analytical gaps in Dr. Proctor's reasoning with respect to his proposals for a reasonable alternative design to overcome the alleged "single point failure" he purports to identify.  In his initial expert report, Dr. Proctor provides a brief description of six possible design modifications.  [Ex. A to Proctor Aff. 9-21-07, Doc. 65-2, at 32.]  Assuming for purposes of argument that Dr. Proctor's deposition testimony can be construed as adopting these proposed design modifications under his revised analysis, there is still no reliable explanation of how they are impacted by the substantial modifications to the scissor lift's wiring.

If, for example, it is possible for Defendant United Rentals' mechanics to disregard the manufacturer's existing instructions and warnings by altering the scissor lift's wiring so as to bypass the existing interlock device, then is it not equally possible that these mechanics could disregard any additional warnings and alter the scissor lift so as to bypass the alternative safety features that Dr. Proctor recommended?  And if Defendant United Rentals' mechanics or other users already were confused by the level of detail or complexity in the existing wiring and instructions for the scissor lift, then what are the chances that they would become even more confused by the addition of further switches, devices, systems, or instructions on the equipment?  "'[T]he proper methodology for proposing alternative designs includes more than just conceptualizing [such] possibilities.'"  Guy v. Crown Equipment Corp., 394 F.3d 320, 327 (5th Cir. 2004) (quoting Watkins v. Telsmith, Inc., 121 F.3d 984, 992 (5th Cir. 1992)).

Neither Dr. Proctor's deposition testimony nor any of the reports which he appears to adopt in that testimony show that he actually tested his theory that the addition of one or more of the redundant safety features he has conceptualized would have remedied the "single point failure" he purports to identify. "[C]ourts interpreting Daubert have considered testability of the expert's theory to be the most important of the four factors [identified in that opinion], and this is especially true in cases involving allegations of defect in product design." Berry v. Crown Equipment Corp., 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000). In particular, "[c]ourts have consistently recognized the importance of testing the alternative design proposed by a witness," 3 Louis R. Frumer & Melvin I. Friedman, Products Liability, § 18A.04[6][g], at 18A-80.13 (2008), especially where the expert has not utilized any other method of research to compensate for the lack of alternative testing, Winters v. Fru-Con Inc., 498 F.3d 734, 742-43 (7th Cir. 2007).  See Johnson v. Manitowoc Boom Trucks, Inc., 406 F. Supp. 2d 852, 861-62 (M.D. Tenn. 2005) (applying this principle to a proposed alternative design involving "a boom-outrigger interlock system"), aff'd, 484 F.3d 426 (6th Cir. 2007).

> Testing an alternative design can assist a proposed expert in considering: (1) the alternative's compatibility with existing systems, (2) relative efficiency of the current versus alternative design, (3) short and long term maintenance costs for the alternative design, (4) ability of the proposed purchaser to service and maintain the alternative design, (5) cost of installing the alternative design, and (6) change in cost to the machine.

Winters, 498 F.3d at 742.  These factors are relevant to an expert's task of assisting the trier of fact because under New Mexico's products-liability law, "the design of a product need not necessarily adopt features which represent the ultimate in safety." NMUJI 13-1407.  Rather,

the trier of fact "should consider the ability to eliminate the risk without seriously impairing the usefulness of the product or making it unduly expensive." Id.

Dr. Proctor's methodology in the present case contains no analysis of the above factors, through testing or otherwise. He does not even provide a schematic drawing showing how the scissor lift would function with his proposed alternative design, see Johnson, 406 F. Supp. 2d at 862, or a reference to other comparable scissor lifts on the market which already contain the alternative safety features that he proposes, see Sappington v. Skyjack, Inc., 512 F.3d 440, 449 (8th Cir. 2008). [Proctor Dep. at 150-51, 206-20.] He further admits in his deposition testimony that he has not done any research to collect accident data on scissor lifts [Proctor Dep. at 93-96], and he has never been involved in the design of a scissor lift or any other piece of equipment that has gone into production for sale to the public [Proctor Dep. at 106-07].

Thus, the Court is left to rely on Dr. Proctor's ultimate conclusion without any analysis of the relevant factors identified above. This is legally insufficient to meet Plaintiffs' burden of showing that Dr. Proctor's opinions are admissible under Fed. R. Evid. 702. "'An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless,'" Winters, 498 F.3d at 743 (quoting Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir.1999)), because it leaves "an impermissible analytical gap . . . between premises and conclusion." Bitler, 400 F.3d at 1233.

A similar problem arises with respect to Dr. Proctor's opinions about the effect of providing additional warnings or directions about the link between the "drive-speed cut-out

switch" circuitry and the controls for the leveling jacks.  In order to make the extensive modifications to the wiring that are undisputably present in the scissor lift at issue in this case, and in order to send the machine into operation with other noticeable modifications such as the disconnected green light on the platform control box and the two female cable connectors, users of this product necessarily must have ignored, disregarded, or failed to notice the existing warnings and directions which told them not to modify or operate the scissor lift under these circumstances.  Dr. Proctor's methodology fails to reliably explain, through testing or other research, how it is reasonable to infer that a user of the scissor lift would notice and comply with the additional warning or direction that Dr. Proctor suggests, when that same user's conduct evinces that he or she already failed to notice, or elected to disregard, the existing warnings or directions which prohibit the same conduct.

As noted previously, it is not enough to simply conceive of an additional warning or direction that could be added to a thick manual that is already replete with numerous other warnings and directions, because "[r]equiring too many warnings trivializes and undermines the entire purpose of the rule, drowning out cautions against latent dangers of which a user might not otherwise be aware.  Such a requirement would neutralize the effectiveness of warnings as an inexpensive way to allow consumers to adjust their behavior based on knowledge of a product's inherent dangers." Liriano, 700 N.E.2d at 308.  "Product warnings and instructions can rarely communicate all potentially relevant information, and the ability of a plaintiff to imagine a hypothetical better warning in the aftermath of an accident does

not establish that the warning actually accompanying the product was inadequate."
Restatement (Third) of Torts, supra § 2, cmt. i, at 29.

It follows that to assist the trier of fact within the meaning of Fed. R. Evid. 702, an expert opinion in this case should not only identify an additional warning or direction, but also provide a reliable explanation of how this additional warning or direction would be read and understood by users in the context presented by the existing warnings and directions. Under New Mexico's Uniform Jury Instructions, the adequacy of warnings or directions may depend not only on the engineering principles which identify the risks to be warned against, but also upon the linguistic principles necessary to communicate that risk in an effective manner. See NMUJI 14-1418; cf. Victor E. Schwartz & Russell W. Driver, Warnings in the Workplace: The Need for a Synthesis of Law and Communication Theory, 52 U. Cin. L. Rev. 28, 43-44 (1983) (explaining for need for scientific study of the relationship between identifying a risk and effectively communicating a warning of that risk). It is for this reason that, in certain contexts, courts have determined that a witness' general credentials as an engineer do not qualify him or her to offer expert opinions about the adequacy of warnings or directions for a product, unless he or she can demonstrate other specialized knowledge regarding the communication of warnings. See Robertson v. Norton Co., 148 F.3d 905, 907-08 (8th Cir. 1998); Miller v. Pfizer, 196 F. Supp. 2d 1062, 1088 (D. Kan. 2002), aff'd 356 F.3d 1326, 1335 (10th Cir. 2004). The exclusion of expert testimony that lacks such specialized knowledge is consistent with the Tenth Circuit's reasoning in Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969-70 (10th Cir. 2001), which recognized that a

medical degree is insufficient to qualify a physician to give expert testimony about the adequacy of a warning for a specialized product.

Dr. Proctor admitted in his deposition testimony that he has never designed or drafted warnings or instructions for use of a scissor lift, boom lift, or any other type of aerial work platform.  [Proctor Dep. at 108.]  He also admitted that he has not done any research or testing to support the inference or hypothesis that employees of Defendant United Rentals, or the company to which it rented the scissor lift, would have done anything differently if the wording in Defendant JLG's manuals had been amended to include his suggested warnings or instructions.  [Proctor Dep. at 181-83; 201-06.]  For the above reasons, I conclude that Dr. Proctor's deposition testimony about the adequacy of Defendant JLG's warnings or directions for the scissor lift also is inadmissible under Fed. R. Evid. 702.

**C.     Dr. Proctor's Second Affidavit Dated February 18, 2008**

In an attempt to overcome the deficiencies in Dr. Proctor's first affidavit dated September 21, 2007, and his deposition testimony dated December 11, 2007, Plaintiffs submitted a second affidavit by Dr. Proctor dated February 18, 2008.  [Ex. A to Doc. 164-2.] Defendants object to this second affidavit on the grounds that it is both untimely under Fed. R. Civ. P. 26 and inadmissible under Fed. R. Evid. 702.

I first consider the timeliness arguments relating to Dr. Proctor's second affidavit dated February 18, 2008.  Federal Rule of Civil Procedure 26(a)(2) generally requires the timely disclosure of detailed information regarding expert witnesses whom a party specially retains for the purpose of testifying at trial.  Unless otherwise stipulated or directed by the

Court, this rule requires the disclosure of the retained expert's identity and a written report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) the data or other information considered by the witness in forming them;

> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  These requirements are enforceable through Fed. R. Civ. P. 37(c)(1), which provides for sanctions, including the exclusion of evidence that is not timely disclosed in a party's expert reports.  See Gutierrez v. Hackett, 131 Fed. Appx. 621, 625-26 (10th Cir. 2005) (unpublished disposition citing Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir.2002)).

Pursuant to Fed. R. Civ. P. 16(b) and 26(a)(2)(C), the Court entered an *Order* [Doc. 56] setting a deadline of August 29, 2007, for the disclosure of Plaintiffs' expert reports, and a deadline of October 10, 2007, for the disclosure of Defendants' expert reports.  The Court's *Order* [Doc. 56] did not provide for supplemental reports or rebuttal reports pursuant to Fed. R. Civ. P. 26(a)(2)(C)(ii) or 26(e)(1)(B), and no such provision was sought by the parties in the joint motion which led to that *Order*.  [Doc. 47.]

Nevertheless, the parties were required to supplement their expert-witness disclosures as necessary pursuant to Fed. R. Civ. P. 26(a)(2)(D) and 26(e)(2). Supplementation is generally required "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). This requirement applies to both expert reports and expert deposition testimony. See Fed. R. Civ. P. 26(e)(2); Miller v. Pfizer, Inc., 356 F.3d 1326, 1332 (10th Cir. 2004). Courts have noted, however, that supplementation of an expert report under Fed. R. Civ. P. 26(a)(2)(D) cannot be used as a pretext to avoid sanctions under Fed. R. Civ. P. 37(c)(1), especially when the purported "supplementation" is based on evidence that was available before the deadline for filing the initial expert reports. See Salgado v. General Motors Corp., 150 F.3d 735, 738-43 (7th Cir. 1998).

In this case, the Magistrate Judge's *Order* [Doc. 99] permitting additional testing of the scissor lift on December 6, 2007, provided grounds for Dr. Proctor to supplement his initial expert report in order to account for the results of that testing. The opportunity to present such supplementation in an admissible form occurred when Dr. Proctor was deposed on December 11, 2007. But when specifically asked at his deposition whether "there are any corrections or changes that need to be made in those reports," Dr. Proctor responded that "[t]he only change that would be made would be on the original report where I referred to 'the switch,' and it should be referred to as the 'switch assembly,' and then that would clarify the misunderstanding that I had from the original testing in August regarding whether the

functional test was correct." [Proctor Dep. at 136.] Dr. Proctor then stated that "there wouldn't be any other changes." [Proctor Dep. at 136.]

In light of the record summarized above, I find that Dr. Proctor's second affidavit dated February 18, 2008, is untimely and does not constitute proper supplementation or rebuttal under Fed. R. Civ. P. 26(a)(2)(C)(ii), 26(a)(2)(D), or 26(e)(1)(B), or 26(e)(2). I further find that the untimely disclosure of Dr. Proctor's second affidavit after the close of discovery is not substantially justified or harmless under Fed. R. Civ. P. 37(c)(1), because such untimely disclosure interferes with the Court's case-management deadlines in a way that unfairly prejudices the Defendants' ability to brief dispositive motions and prepare for trial, and because the timing of Dr. Proctor's affidavit is not premised on any exigency such as the discovery of new evidence or a recent change in the law. Rather, Dr. Proctor's second affidavit relies on various materials that were available to him at the time of his deposition and should have been disclosed pursuant to subpoena at that time.

I also find that Dr. Proctor's second affidavit dated February 18, 2008, is a "sham affidavit" that must be disregarded insofar as it contradicts his sworn deposition testimony. See Ralston, 275 F.3d at 973-74. The contradiction at issue here could not be more glaring, as Dr. Proctor's attempt to supplement his deposition testimony with an eighteen-page affidavit disclosed more than two months after his deposition was completed [Ex. A to Doc. 164-2] cannot be reconciled with his sworn deposition testimony that the only change he wanted to make to his previous reports was to add a clarification regarding his use of the words "the switch" and the "switch assembly." With that clarification, he specifically stated

that "there wouldn't be any other changes." [Proctor Dep. at 136.] There are further contradictions between the explanation given in Dr. Proctor's deposition testimony regarding his failure to recognize the need for additional testing during the August 2007 inspection of the scissor lift, and the subsequent explanation for the omission of this additional testing given in his second affidavit. [Compare Proctor Dep. at 6-24, 30-65, with Ex. A to Doc. 164-2, at 8-13.]

Dr. Proctor was cross-examined extensively regarding all of these topics at his deposition. He had access to the pertinent evidence at the time of his earlier deposition testimony and was acting under a subpoena which directed him to bring that evidence to the deposition. Finally, his earlier deposition testimony does not reflect confusion which calls for clarification in his subsequent affidavit. Far from expressing confusion, doubt, or uncertainty about his testimony or the completeness of his expert reports, Dr. Proctor plainly stated during his deposition that "there wouldn't be any other changes." [Proctor Dep. at 186.] The changes expressed in his subsequent affidavit did not arise until Plaintiffs' response to Defendant JLG's motion for summary judgment became due, thereby creating the need to manufacture a "sham fact issue" under Franks, 796 F.2d at 1237. Accordingly, Dr. Proctor's affidavit meets all the criteria for exclusion under the "sham affidavit" rule articulated in Ralston, 275 F.3d at 973.

In the alternative, I determine that to the extent Dr. Proctor's second affidavit dated February 18, 2008, was disclosed in a timely manner, the opinions expressed therein are nevertheless inadmissible under Fed. R. Evid. 702. Without repeating all of the foregoing

-48-

analysis of the factors bearing on the reliability and relevance of Dr. Proctor's opinions under Daubert and its progeny, I note that there is one additional factor which is particularly applicable to his second affidavit dated February 18, 2008.  Courts have "recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution."  Johnson, 484 F.3d at 434 (citations omitted).  While this principle should not be construed so narrowly as to limit plaintiffs in products-liability cases to the pool of experts who are already employed by or financially dependent on manufacturers and industry groups, it nevertheless applies with special force to the exceptional circumstances of Dr. Proctor's second affidavit in this case.  This second affidavit does not flow naturally from some ongoing line of scientific research or technical work that Dr. Proctor is performing apart from this litigation.  Rather, the second affidavit evinces the great extent to which his testimony is being molded to meet the particular demands of this litigation.

When Plaintiffs decided to move for summary judgment on their failure-to-warn claims, Dr. Proctor prepared his initial expert report and first affidavit to emphasize certain facts or theories in support of those claims.  When Defendant United Rentals moved for summary judgment on Plaintiffs' negligence claim, Dr. Proctor responded with a supplemental report and a request for additional testing that relied on different facts and theories which had more relevance to Defendant United Rentals' liability.  And when Defendant JLG moved for summary judgment, Dr. Proctor again responded with a third

variation in his testimony to tailor his data and theories to Plaintiffs' claims against Defendant JLG.  Such extreme dependence on the context supplied by a particular phase of the litigation suggests that the evolution of Dr. Proctor's opinions in this case does not rest on the reliable application of a consistent set of theories and data, but is instead based on mere rhetoric clothed in technical or scientific jargon.

Accordingly, I determine that all of the iterations of Dr. Proctor's evolving opinions about Defendant JLG's liability in this case are inadmissible under Fed. R. Evid. 702 and cannot be used to establish a genuine issue of material fact in response to Defendant JLG's motion for summary judgment.  I express no opinion about Dr. Proctor's professional reputation as an engineer or the prospect that his testimony might be admissible in any other case.

### D.   Mr. Gallagher's Deposition Testimony of November 30, 2007

In addition to Dr. Proctor, Plaintiffs have proffered the testimony of a second liability expert, Mr. Vincent Gallagher.  I next consider the admissibility and timeliness of Mr. Gallagher's deposition testimony taken on November 30, 2007.  This testimony indicates that Mr. Gallagher's work is entirely related to litigation.  [Gallagher Dep. at 80.]  He has written articles on how to be an artful expert witness [Gallagher Dep. at 131-37], and this skill is evident in his non-responsive or evasive answers to defense counsel's questions during his deposition. [Gallagher Dep. at 107-09, 144-54, 224-231, 243-45, 254-57, 261-62.] Accordingly, for the same reasons previously stated with respect to Dr. Proctor's second

affidavit, the Court views the testimony of Mr. Gallagher with some caution when performing its gatekeeping role under Daubert.  See Johnson, 484 F.3d at 434.

Mr. Gallagher's deposition testimony further indicates that he has not performed any testing of the equipment at issue in this case.  Rather, his testimony is based on his review of documents and photographs, including Dr. Proctor's initial expert report dated September 21, 2007. [Gallagher Dep. at 42-43, 261-62.] Mr. Gallagher's own initial expert report dated August 28, 2007, describes his methodology as a process of comparing the conduct of Defendant JLG in this case to "the principles and practices of product safety management established by industry safety authorities."  [Ex. 5 to Doc. 161-3, at 3.]  While Plaintiffs correctly point out that Fed. R. Evid. 703 does not necessarily preclude an expert from basing an opinion on hearsay statements contained in documents authored by another witness rather than firsthand knowledge, the fact remains that Mr. Gallagher's methodology is heavily dependent on the documents that he relied upon to ascertain the facts concerning Defendant JLG's conduct.

As noted above, Dr. Proctor's first affidavit, and the initial expert report on which it is based, do not meet the requirements for admission under Fed. R. Evid. 702 because they lack a sufficient factual basis and a reliable application of the methodology to the facts.  See Johnson, 484 F.3d at 429; Mamah, 332 F.3d at 477-78.  In particular, Dr. Proctor's first affidavit and initial expert report are based on the undisputably false premise that "[a]ll systems related to the operation of the leveling jacks were examined" and that  "all operational systems for the leveling jacks were shown to operate correctly with the exception

of the Drive Speed Cut-Out Switch assembly." [Doc. 65-2, at 25.] Dr. Proctor subsequently testified that he was under the mistaken impression that functional testing of the circuitry associated with the interlock device or "drive speed cut-out switch" had been performed prior to the disclosure of his first initial expert report in August 2007, when in fact such testing had not yet occurred.

Insofar as Mr. Gallagher relies on Dr. Proctor's initial expert report as the basis for his assertion that the accident can be attributed to a "single point failure," [Gallagher Dep. at 261-62,] his opinions are inadmissible under Fed. R. Evid. 702 for the same reasons that the Court previously articulated with respect to Dr. Proctor's first affidavit and initial expert report. Because Dr. Proctor failed to test or otherwise account for the extensive post-sale modifications to the scissor lift involved in the accident, the documents authored by Dr. Proctor on which Mr. Gallagher relies for his comparative methodology do not contain an accurate or complete description of Defendant JLG's conduct. Without such a description of Defendant JLG's conduct, Mr. Gallagher lacks a relevant or reliable basis on which to compare that conduct to the principles and practices of product safety management that he purports to identify in his testimony.

In addition to the "single point failure" theory relating to the "drive speed cut-out switch" that was previously disclosed in Plaintiffs' initial expert reports, Mr. Gallagher's deposition testimony opines about the leveling-jack controls on the platform control box. Specifically, Mr. Gallagher opines that these controls were not adequately protected against inadvertent actuation because: (1) the ANSI standard requires "protection" [Gallagher Dep.

at 144-45, 150-54], and (2) he viewed a photograph of the controls on the platform control box which led him to believe that a user of the controls could inadvertently bump his or her leg against the controls. [Gallagher Dep. at 270-71.]

Defendant JLG correctly points out that Mr. Gallagher's deposition testimony concerning the application of the ANSI standard to the leveling-jack controls is untimely under Fed. R. Civ. P. 26, because his opinion on that topic was not previously disclosed in his initial expert report disclosed on August 28, 2007. Both the ANSI standard and the photographs of the platform control box that Mr. Gallagher relied upon in forming his opinion were available to him before that deadline; they are not the product of any additional testing that Dr. Proctor performed on the scissor lift at a later date.

For these reasons, I find that Mr. Gallagher's opinion about the application of the ANSI standard to the leveling-jack controls is not proper supplementation under Fed. R. Civ. P. 26(e), and that Plaintiffs' delay in disclosing this opinion is not substantially justified under Fed. R. Civ. P. 37(c)(1). I further find that this delay is not harmless, as it unfairly prejudices Defendants' ability to comply with the case-management deadlines which are necessary for a fair and orderly disposition of this case. Accordingly, Mr. Gallagher's deposition testimony about the application of the ANSI standard to the leveling-jack controls must be excluded under Fed. R. Civ. P. 37(c)(1).

In the alternative, I also find that Mr. Gallagher's deposition testimony concerning the leveling-jack controls does not meet the reliability and relevance requirements for admission under Fed. R. Evid. 702 and will not assist the trier of fact. In this regard, I view Mr.

Gallagher's testimony on this subject in the context of the equivocal and non-responsive statements he made when first asked at his deposition about the completeness of the reports he had previously submitted in this case.

When first asked whether his "reports contain all of your opinions in this case," Mr. Gallagher said "no" and identified two specific opinions pertaining to whether Plaintiffs were the cause of their own injury and whether Plaintiffs' employer violated any OSHA standards.[5]  Mr. Gallagher then equivocated on whether he had any other opinions that are not contained in his reports, stating that: "I have done this quite frequently and it's invariable that you will ask questions or [another] attorney will ask questions that will lead me to an answer that somebody else could say [is] a different opinion."  [Gallagher Dep. at 106.] About 40 pages later in his deposition, when defense counsel was attempting to confirm or clarify that Mr. Gallagher was "not testifying  that any ANSI standards were violated in the design or manufacture of the JLG 500 RTS" scissor lift, Mr. Gallagher stated:  "Only the one related to the lack of cover over the controls.  That's an opinion that, I'm sorry, I didn't express to you earlier.  I meant to tell you."  [Gallagher Dep. at 144-45.]

The fact that this opinion arose for the first time in such an inadvertent manner during the course of Mr. Gallagher's deposition--and then only several minutes after counsel had

---

[5]As noted above, the comparative negligence of Plaintiffs or their employer may be relevant to the issue of apportioning damages but is not directly relevant to the pending motion for summary judgment concerning Defendant JLG's liability for the accident.  Viewing the evidence in the light most favorable to Plaintiffs, the Court assumes for purposes of analysis that apportionment of damages under principles of comparative responsibility would not be dispositive of Defendant JLG's motion for summary judgment, regardless of what percentage of responsibility for the accident is attributed to Plaintiffs or their employer.

specifically asked whether his previous reports contained all his opinions in this case–further emphasizes the great extent to which Mr. Gallagher's opinions are developed in an *ad hoc* manner to suit the needs of his clients' position in each particular phase of this litigation, rather than through the consistent application of an objective, independent, and reliable methodology.  See Johnson, 484 F.3d at 434.

I also find that Mr. Gallagher's deposition testimony about the possibility of mounting some type of additional guard, cover, or protection over the leveling-jack controls on the platform control box is inadmissible for the same reasons previously expressed with respect to Dr. Proctor's alternative design concepts.  Mr. Gallagher's conception of how such an alternative guard, cover, or other protection would operate is even more sketchy than that of Dr. Proctor.  In his deposition testimony, Mr. Gallagher first refers to "the lack of cover over the controls." [Gallagher Dep. at 144.] He then equivocates over whether the ANSI standard requires "guards" or just "protection," eventually settling on the answer that "[g]uards would be one of the ways you could protect it.  You could have other types of designs to protect." [Gallagher Dep. at 147.]  Later in his deposition testimony, Mr. Gallagher adds that:  "The standard doesn't require that only a physical barrier guard can be used.  You could recess controls so you can't brush up against them." [Gallagher Dep. at 154.]  Ignoring the fact that the leveling-jack controls depicted in the manuals and photographs cited in the parties' briefs and expert reports *are* contained in a recessed area on the side of the platform control box, Mr. Gallagher nevertheless opines that:  "When I looked at the photo, I was performing sort

of a test," because "[i]t's a toggle switch right in the area where the worker's leg is." [Gallagher Dep. at 271.]

Mr. Gallagher's deposition testimony does not reflect the type of reliable methodology for testing or researching an alternative design that courts have required as a precondition for admitting expert opinions on this subject.  See Guy, 394 F.3d at 327; Winters, 498 F.3d at 742-43; Johnson, 406 F. Supp. 2d at 861-62.  Further, if the "test" for determining whether a particular design meets an ANSI standard is simply to look at a photograph, then that is a test which a jury can perform without the aid of an expert witness.  It is not the role of an expert witness to "unduly invade the province of the jury when assistance of the witness is unnecessary" and "'merely tell the jury what result to reach,'" Sims, 469 F.3d at 889 (quoting Fed.R.Evid. 704 advisory committee notes), nor is it the role of an expert to usurp the jury's task of determining which factual scenarios are more believable.  See United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001).  It follows from the analysis provided above that the opinions expressed in Mr. Gallagher's deposition testimony are inadmissible for purposes of supporting Plaintiffs' response to Defendant JLG's motion for summary judgment.

### E.      Mr. Gallagher's Affidavit Dated February 18, 2008

Having concluded that Mr. Gallagher's deposition testimony contains no admissible expert opinions to support Plaintiffs' response to Defendant JLG's motion for summary judgment, I next turn to his affidavit dated February 18, 2008.  A large portion of Mr. Gallagher's affidavit is devoted to expanding upon his qualifications and citing articles he

has published and cases in which courts have permitted him to testify as an expert.  To the extent these portions of Mr. Gallagher's affidavit are relevant, I determine that they are untimely attempts to change his sworn deposition testimony in violation of Fed. R. Evid. 26 and the "sham affidavit" rule articulated in <u>Ralston</u>, 275 F.3d at 973.  At the time of his deposition testimony, Mr. Gallagher had access to the articles and cases he cites in support of his qualifications.  Rather than reflecting confusion or a lack of understanding about the questions he was asked, Mr. Gallagher's deposition testimony reflects non-responsiveness and perhaps a deliberate effort to avoiding committing to an answer.

I reach a different conclusion with respect to Paragraph 8 of Mr. Gallagher's affidavit, in which he states that:

> one of the design defects as identified by Dr. Proctor, even with the modifications to the lift, is that the 500 RTS scissor lift had a single point failure design in a life critical safety device.  Dr. Proctor's opinion is that if the life critical safety device failed or was bypassed, the lift was designed in such a manner that no other safety device was present to prevent retraction of the leveling jacks when the lift was elevated.  It is my opinion, as provided in my reports, that JLG's violations of the principles and practices of product safety management and hazard control in the design of 500 RTS scissor lift were one of the causes of the accident that led to the deaths of Mr. Magoffe and Mr. Michel.

[Ex. 1 to Doc. 161-2, at 4.]  Because Mr. Gallagher's deposition was taken before Dr. Proctor completed his additional testing of the scissor lift on December 6, 2007, as permitted by the Magistrate Judge's *Order*, I determine that this paragraph of Mr. Gallagher's affidavit meets the criteria for timely supplementation of an expert report under Fed. R. Civ. P. 26(e).  In this paragraph, Mr. Gallagher is simply clarifying that he maintains the opinions he expressed

earlier notwithstanding the results of Dr. Proctor's additional testing, which confirmed the existence of modifications to the lift.

This paragraph of Mr. Gallagher's affidavit is nevertheless too vague and conclusory to form a reliable basis for admitting an expert opinion under Fed. R. Evid. 702. The "single point failure" theory on which both of Plaintiffs' experts rely is contrary to the undisputed facts admitted in Plaintiffs' response to Defendant JLG's motion for summary judgment, which identify several components of the scissor lift which were modified in order to effect the bypass of its interlock device. The "single point failure" theory also is inconsistent with the assertion that the accident had *multiple* causes due to the presence of extensive modifications to *several* components.

In order to explain this gap between the "single point failure" theory and the undisputed facts concerning the multiple modifications or intervening causes that preceded the accident, it is not enough for Mr. Gallagher to simply restate his qualifications and cite other cases in which courts have allowed him to testify. Rather, Mr. Gallagher must set forth the intermediate steps in his reasoning in a more coherent and timely manner. See Joiner, 522 U.S. at 146. Because he has not done so, I conclude that the expert opinions stated in his affidavit are inadmissible under Fed. R. Evid. 702 for the purpose of supporting Plaintiffs' response to Defendant JLG's motion for summary judgment.

## F.   Opinions Expressed by Defendants' Experts

The next category of evidence that Plaintiffs seek to marshal in opposition to Defendant JLG's motion for summary judgment consists of various excerpts from the reports

and testimony of Defendants' experts.  Specifically, Plaintiffs' response to Defendant JLG's motion for summary judgment [Doc. 168] cites the following:  (1) the deposition testimony of Steve Forgas, Defendant JLG's Product Safety and Reliability Manager [Forgas Dep. 9-12-07, Ex. C to Doc. 83-2, Ex. F to Doc. 164-3]; (2) the deposition testimony of Dr. Francis Wells, an expert retained by Defendant JLG in this litigation [Ex. I to Doc. 164-3]; and (3) the deposition testimony of Dr. Scott Kritschke, a witness for Defendant United Rentals [Ex. J to Doc. 164-3.]

The basic problem with Plaintiffs' reliance on these materials is that they are taken out of context and are premised on the existence of the hypothetical scenarios previously referenced in the testimony of Dr. Proctor and Mr. Gallagher, which do not correspond to the undisputed facts.  These hypothetical scenarios simply do not find support in the record because there is no admissible evidence that the scissor lift's "drive speed cut out switch" or "interlock device" failed or malfunctioned, nor is there any evidence of a simple failure (such as a loose connection or crossed wire) in the circuitry immediately associated with this switch or device.  Rather, Plaintiffs have admitted to undisputed facts which show that the switch or device which otherwise would have disabled the leveling-jack controls was bypassed–not through some basic failure of the interlock device itself or the circuit directly attached to it–but instead through extensive, post-sale modifications to the wiring in the scissor lift's ground terminal, cable connectors, and platform control box.

In this regard, Dr. Wells deposition testimony describes the "drive speed cut-out switch assembly" as a circuit "that controls – that goes to the brown wire and controls the

bank of limit switches and also the drive speed switch." [Wells Dep. at 94, Ex. I to Doc. 164-3.] Notably, he does not include in his definition of "drive speed cut-out assembly" the additional wiring and other modifications to the ground terminal, cable connectors, and leveling-jack controls in the platform control box. And when taken in context, his testimony is that the "drive speed cut-out switch assembly did not perform properly" because it was bypassed, not because of some failure in the switch or circuit itself (such as a loose connection). [Wells Dep. at 94-97.] Thus, the need for the hypothetical warnings that Dr. Wells and Mr. Forgas discuss in their deposition testimony arises from the modifications to the scissor lift, not from its original design.

The deposition testimony of Mr. Forgas that is cited in Plaintiffs' response was taken on September 12, 2007, at which time Plaintiffs and Dr. Proctor were proceeding on the incorrect assumption that the scissor lift's wiring had not been modified in any material way and that the "drive speed cut out switch" or "interlock device" had failed. Mr. Forgas' hypothetical testimony that the "switch may or may not work properly" is not material because the undisputed facts and evidence of record show that the switch was bypassed such that it could not have prevented the accident regardless of whether the switch itself was working properly in this case. [Forgas Dep. at 93, Ex. C to Doc. 83-2.]

Mr. Forgas' testimony regarding the possibility of extending the "lip" around the bottom of the platform control box did not change his opinion that the existing guarding and safety features for the leveling-jack controls were adequate to protect against foreseeable hazards. On this point, he testified that: "We felt the guarding that we had on there was

adequate to protect the switch from the things I said earlier." [Forgas Dep. at 102-105, Ex. F to Doc. 164-3.] Plaintiffs have not pointed to any admissible evidence showing that the accident was caused by a failure to place a lip around the bottom of the recessed area on the platform control box. For the reasons previously stated with respect to the alternative-design theories of Dr. Proctor and Mr. Gallagher, the mere possibility that such a lip could be feasible does not support a reasonable inference that the existing guarding around the leveling-jack controls was inadequate or had any foreseeable causal relationship to the accident.

Finally, the cursory reference to Mr. Kritschke's deposition testimony [Ex. J to Doc. 164-3] in Plaintiffs' response to Defendant JLG's motion for summary judgment [Doc. 168, at 6] does not provide an adequate foundation for opining about the adequacy of warnings or who bears the responsibility for providing additional warnings regarding the new hazards created by the post-sale modifications to the scissor lift involved in the accident. For these reasons, none of the excerpted statements from Defendants' experts or employees that Plaintiff cites in its response to Defendant JLG's motion for summary judgment provide relevant and reliable opinions which are admissible under Fed. R. Evid. 702 in this context.

### G.  Mr. Magoffe's Affidavit Dated February 18, 2008

The last item that Plaintiffs cite and attach with their response to Defendant JLG's motion for summary judgment is an affidavit by Plaintiff James Magoffe dated February 18,

2008.[6]  [Doc. 168-2.]  Plaintiff Magoffe was present at the scene of the accident when it

occurred, and part of his affidavit consists of factual testimony about his background and

what he perceived or felt on the date of the accident.  [Magoffe Aff. 2-18-08,  ¶ 1-4.]

Another portion of his affidavit consists of hypothetical answers explaining what Plaintiff

Magoffe believes he would have done if he "had known that the high speed cut out switch

also controlled the interlock device for the leveling jacks" [Magoffe Aff. 2-18-08, ¶ 5], if

"the directions and warnings for the RTS500 had communicated the relationship between the

drive speed cut out switch and the safe and stable operation of the leveling jacks" [Magoffe

Aff. 2-18-08, ¶ 6], and "if the directions and warnings had provided a test or a warning to

confirm that the interlock for the leveling jacks was operating properly" [Magoffe Aff. 2-18-

08, ¶ 7].  In the final portion of his affidavit, Plaintiff Magoffe opines that "the lack of such

a warning or instruction to test caused the accident which injured me and which killed my

brother and my friend."  [Magoffe Aff. 2-18-08,  ¶ 7.]

        Defendant JLG moves to strike the hypothetical answers contained in Plaintiff

Magoffe's affidavit and his opinion about what caused the accident on the grounds that they

are not proper lay opinion testimony under Fed. R. Evid. 701.  [Doc. 184.]  In support of its

motion, Defendant JLG correctly cites the proposition that lay opinion testimony must be

"rationally based on the perception of the witness" and not based on either "scientific,

technical, or other specialized knowledge," Fed. R. Evid. 701, or speculation concerning a

_____

        [6]The Court refers to Mr. James Magoffe as "Plaintiff Magoffe" in order to distinguish him
from his brother who died in the accident.

scenario that the witness did not, in fact, perceive, see Armistead v. Allstate Ins. Co., No. CIV 06-0017 MCA/DJS, 2007 WL 4618467, at *4 (D.N.M. Apr. 5, 2007) (unpublished memorandum opinion and order collecting cases).  Courts have held that this rule does not permit a lay witness to speculate about whether he or she would have followed a hypothetical warning or what the hypothetical effect of that warning would be.  See, e.g., Kloepfer v. Honda Motor Co., Ltd., 898 F.2d 1452, 1459 (10th Cir. 1990); Washington v. Dep't of Transp., 8 F.3d 296, 300 (5th Cir. 1993).  Even assuming for purposes of argument that the additional warnings suggested by Plaintiff Magoffe's hypothetical scenarios should have been given and would have been effective, his affidavit lacks a rational basis for opining about who was responsible for providing these warnings because he states no personal knowledge of what modifications, if any, had been made to the scissor lift before it came into the possession of his employer.

Accordingly, I conclude that Fed. R. Evid. 701 does not permit Plaintiff Magoffe to offer opinions about (1) what he *would have done* in a hypothetical scenario that he never actually perceived, or (2) the effectiveness of a particular warning or test that was never actually provided to him, or (3) who was responsible for particular acts or omissions that preceded his experience with the scissor lift.  Testimony about these topics goes too far into the realm of speculation for a lay witness and requires additional foundation in the form of scientific, technical, or other specialized knowledge of an expert who has been timely identified pursuant to Fed. R. Civ. P. 26.

I also note that Plaintiffs have not come forward with admissible evidence that the "high speed cut out switch," "drive speed cut out switch," or "interlock" referenced in Plaintiff Magoffe's affidavit were not operating properly at the time of the accident due to some act or omission by Defendant JLG.  Rather, the undisputed facts indicate that these components of the scissor lift could not have caused or prevented the accident because they had been *bypassed* as a result of the extensive post-sale modifications to the scissor lift's ground terminal, cable connectors, and platform control box.  Plaintiff Magoffe's affidavit does not support a reasonable inference that such extensive post-sale modifications were performed by, or otherwise foreseeable to, Defendant JLG.

On the contrary, Plaintiff Magoffe's affidavit only adds further support to the inference that such post-sale modifications were *not* reasonably foreseeable to Defendant JLG.  As noted in the Committee comment to NMUJI 13-1425, the notion that warnings are presumed to be heeded by those who read them may apply to both actual, existing warnings and hypothetical warnings that could have been given.  See id. (citing Technical Chem. Co. v. Jacobs, 480 S.W.2d 602, 606 (Tex. 1972), for the principle that "where a warning is given, the seller may reasonably assume that it will be read and heeded").  In this case, Plaintiff Magoffe's statements regarding his past training and experience support an inference that he was familiar with the existing warnings and directions for the scissor lift, and that he was inclined to follow these existing warnings and directions.  If the trier of fact were to make such an inference, then it would not be reasonably foreseeable to Defendant JLG that the existing, integrated set of warnings, directions, and safety features would be disregarded and

bypassed so as to allow the scissor lift to be operated in the condition that existed at the time of the accident.

For all of the reasons cited above, Plaintiffs have failed to produce admissible evidence in support of their contention that there remains a genuine issue of material fact as to any of their theories of liability as to Defendant JLG.  It follows that Defendant JLG is entitled to summary judgment as a matter of law.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Court grants summary judgment in favor of Defendant JLG and dismisses all of Plaintiffs' claims against Defendant JLG with prejudice, taking into account the inadmissibility and untimeliness of the opinion testimony on which Plaintiffs rely to support their claims against Defendant JLG.  All other pending motions are addressed in separate rulings filed concurrently herewith, and the Court will enter a separate final order pursuant to Fed. R. Civ. P. 58 upon receipt of closing documents regarding the settlement between Plaintiffs and Defendant United Rentals.

**IT IS THEREFORE ORDERED** that *Defendant JLG Industries, Inc.'s Motion for Summary Judgment* [Doc. 149] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant *JLG's Motion to Exclude Opinions of Charles Proctor* [Doc. 154] is **GRANTED**.

**IT IS FURTHER ORDERED** that  Defendant *JLG's Motion to Exclude Opinions of Vincent Gallagher* [Doc. 155] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant *JLG's Motion to Strike Affidavit of James Magoffe* [Doc. 184] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant *JLG's Motion to Strike Affidavit of Vincent Gallagher* [Doc. 186] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant *JLG's Motion to Strike Affidavit of Charles Proctor* [Doc. 187] is **GRANTED**.

**IT IS FURTHER ORDERED** that all of Plaintiffs' claims against Defendant JLG Industries, Inc. are **DISMISSED WITH PREJUDICE** and Defendant JLG Industries, Inc. is dismissed as a party to this action.

**SO ORDERED** this 7th day of May, 2008, in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**